## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **West Chester Area School District** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | **NO.  16-4471** |
| | : | |
| **G.D., by and through her parents, M.D.** | : | |
| **and K.D., and M.D. and K.D. in their** | : | |
| **own right** | : | |

### MEMORANDUM

**KEARNEY, J.**                                                                                    **January 25, 2017**

Parents challenging a school district's denial of special educational services for their child based on the district's internal evaluation may seek an independent educational evaluation paid by the school district. When disputed, we require an administrative hearing officer evaluate adduced evidence and decide whether the district used adequate methodology in its internal evaluation. When the hearing officer specifies the District's failed methodology in its internal evaluation under Pennsylvania law, we defer to his specific findings.  Today, after reviewing the supplemented administrative record, we find the hearing officer's findings of five reasons the district's internal evaluation employed an inadequate methodology warrants an order requiring the school district pay for an independent educational evaluation. While the district wishes otherwise, we are not deciding whether the otherwise gifted student has a reading disability. We only address whether a hearing officer properly ordered the school district to pay for an independent educational evaluation.  In the accompanying Order, we deny the school district's motion for judgment on the supplemented administrative record seeking to vacate the hearing officer's decision requiring the school district pay for the independent educational evaluation.

## I.  Background

West Chester Area School District ("District") sued Student and Parents seeking to reverse the decision of Pennsylvania Special Education Hearing Officer Jake McElligott ordering it to pay for an independent educational evaluation ("IEE") of potential reading disability. District now moves for judgment on the supplemented administrative record.[1]

Student entered the District for the 2014-2015 school year in second grade, and for the 2015-2016 school year in third grade until Parents withdrew Student from District sometime in January 2016.[2] In December 2015, Parents requested the District perform an evaluation of Student because of Parents' concern Student may have a masked specific learning disability in reading.[3] District conducted the evaluation as requested by Parents.[4]

After its evaluation, the District concluded Student did not exhibit a specific learning disability under the Individuals with Disabilities Education Improvement Act, 20 U.S.C. § 1401 *et seq.* ("IDEA").[5]  Parents disagreed with the District's conclusion and requested the District pay for an IEE.[6] District declined Parents' request and filed a complaint for a due process hearing.[7] After the due process hearing, Hearing Officer Jake McElligott, Esq. ordered the District pay for the IEE in reading.[8]

District appealed from Hearing Officer McElligott's decision. We now address only the propriety of the hearing officer's decision requiring the District to pay for the IEE. Issues relating to the eventual findings regarding the Student's reading issues are not before us.

## II. Analysis

The District argues we must reverse Hearing Officer McElligott's decision, find the District's evaluation complies with the requirements of IDEA, and declare District the prevailing party in the underlying administrative due process hearing. District makes four arguments: (1)

2

Hearing Officer McElligott erred as a matter of law by failing to apply IDEA's framework in determining the appropriateness of the District's evaluation; (2) there is no evidence to support a finding Student has a specific learning disability in reading; (3) Hearing Officer McElligott erred in concluding more information necessitated an IEE in reading; and (4) the later-acquired IEE supports the District's evaluation is appropriate and Student does not have a specific learning disability in reading.

In response, Parents argue the District's complaint is moot because it voluntarily paid for the IEE and, in any case, Hearing Officer McElligott's decision is proper .[9] Student and Parents additionally argue the results of the later-conducted IEE are not relevant and even if considered, show Student's diagnosed anxiety impacts Student's reading ability. Focusing only on the issues before us today, we find the Hearing Officer properly found inadequate methodologies in the District's internal evaluation warranted the District pay for an IEE.

### A. We review the Hearing Officer's decision under a modified *de novo* standard.

When considering an appeal from an administrative decision under IDEA, we apply a "nontraditional standard of review, sometimes referred to as 'modified de novo' review, under which [we] accord 'due weight' and deference to the findings in the administrative proceedings, with factual findings to be considered *prima facie* correct and an explanation required if [we] depart from them."[10] Using this standard, when presented with an appeal from a hearing officer's decision, we receive the record of the administrative proceedings, and following review of the record and the hearing officer's decision, base our decision on the preponderance of the evidence and grant relief as appropriate.[11] We exercise plenary review over the legal conclusions of a hearing officer but must give "due weight" to his factual findings.[12] Where the "state administrative agency has heard live testimony and has found the testimony of one witness to be

3

more worthy of belief than the contradictory testimony of another witness, that determination is due special weight."[13]

Our review based on the preponderance of the evidence "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought."[14]

### B.  IDEA mandates upon the District and Hearing Officer.

Under IDEA, states must establish regulations and procedures to endure all students with disabilities are "identified, located, and evaluated" for special education and related services.[15] This "child-find" requirement requires "school districts identify and evaluate all students who are reasonably suspected of having an educational disability" under IDEA.[16]  Even children, such as Student here, who are "only suspected of having a disability, although they are progressing from grade to grade, are protected by the child-find requirement." [17]

Compliant with IDEA, Pennsylvania requires one of two procedures to determine whether a child has a specific learning disability:

(i)     A process based on the child's response to scientific, research-based intervention, which includes documentation that:

(A) The student received high quality instruction in the general education setting.

(B) Research-based interventions were provided to the student.

(C) Student progress was regularly monitored.

(ii)    A process that examines whether a child exhibits a pattern of strengths and weaknesses, relative to intellectual ability as defined by a severe discrepancy between intellectual ability and achievement, or relative to age or grade.[18]

4

IDEA obligates the District conduct a "full and individual initial evaluation . . .."[19] The evaluation must be comprehensive and thorough enough to identify all of a child's educational needs.[20] IDEA requires an evaluative process use a "variety of tools and strategies," including facts and information provided by a parent, in order to provide a fact finders with pertinent and useful information.[21] Student evaluations are to be administered in a manner most likely to yield relevant and accurate information about what the student knows and can do academically, developmentally, and functionally.[22] The methods and instruments used to examine a student must be technically sound.[23]

When challenging an educational evaluation, the pivotal question is whether the District's methods employed were adequate. "The key to an educational evaluation is the methodology employed."[24] "The conclusions, or lack thereof, cannot be inadequate unless the methodology is inadequate, because that is the only provision in the law." [25] Those challenging a school district's evaluation, typically parents, "cannot simply argue that the evaluation was inappropriate because they disagree with its findings."[26] Because IDEA evaluations depend on the exercise of professional judgment, they are entitled to a reasonable degree of deference. [27] Accordingly, when plaintiffs challenge a decision reached by an educational professional, they must show more than simple disagreement with the conclusion; they must show the professional judgment rendered is actually wrong, and not just in doubt.[28]  For example, a plaintiff must show evidence of a flawed evaluation process, by failing to follow regulatory requirements, or if the district failed to investigate an area of suspected disability with little or no explanation why.[29]

## C. The District's Evaluation Report reviewed by the Hearing Officer.

Our first analysis is whether Hearing Officer McElligott found the District's initial evaluation met IDEA's methodology standards. We find the Hearing Officer specifically found inadequacies in the District's methodology. We begin by reviewing the administrative record.

Student attended school in a neighboring district for first grade. The neighboring district identified Student as gifted requiring a gifted individualized education plan ("GIEP").[30] Student scored above average achievement in testing in all areas, with average achievement in certain areas of reading and numerical operations.[31] At the same time, the neighboring district diagnosed Student with an anxiety disorder but did not identify Student as needing special education.[32]

Student began second grade in the District. A July 2014 Qualitative Reading Inventory found Student instructional at the 2-1 level with an 82% average for comprehension.[33] In September 2014, a Critical Reading Inventory and found Student with a 73% comprehension rate on a fourth grade reading level and instructional on a "weak 4th" grade level, but the District's evaluator noted Student "struggled with text-based questions and critical response questions . . . showing full comprehension of narrative but lack of comprehension of more complex ideas in the expository passage."[34] The District's evaluator found Student proficient in all nine areas of reading assessment, but "not as strong" in other reading areas.[35] Student's GIEP reflected a reading goal for literary texts on a fourth grade level.[36] Over the course of the first two marking periods of the 2014-2015 school year, Student achieved marks of both "basic" and "proficient" in numerous areas of information text assessment, literature assessment, and reading assessment.[37]

At the start of Student's third grade year in September 2015, the District conducted a second Critical Reading Inventory. Student achieved a 70% percent comprehension rate on third

grade text and a 60% comprehension rate of fourth grade level text.[38] The District's evaluator also found Student experienced difficulties recalling details in expository text and recommended Student be monitored over the course of the third grade year for issues in comprehension.[39] The district's evaluator found Student proficient in only three areas of reading assessment.[40] Student's GIEP for third grade noted Student read independently at the late third grade level and instructional at the fourth grade level, and the GIEP removed the reading goal.[41] Student consistently earned high grades for the first marking period of third grade in all subjects.[42]

Parents then contacted the District concerned Student had not made expected academic progress given Student's previous identification as gifted, and Student may have a specific learning disability in reading which may have been masked.[43] Parents requested District to perform a full evaluation.

On January 28, 2016, the District prepared a twenty-six page Educational Report ("ER") concerning Student's educational and personal background.[44] The ER begins with a detailed overview of Student's medical history, her current living situation, and emotional demeanor.[45] The ER includes detailed personal observations by Student's teachers and school officials, including observing Student's interactions and behaviors in the classroom with classmates and teachers.[46]

The ER includes results of extensive testing, conducted over the course of three days, to determine Student's educational development.[47] These tests determined Student's IQ to be in the "extremely high range" placing her in the 99th percentile, but Student's performance on two subsets of the KTEA-III exam (Phonological Processing and Nonsense Word Decoding), placed her in the 27th and 79th percentile respectively.[48] Both of these scores are considered "average" and the District's evaluator considered these scores as areas of "personal weakness."[49] To further

7

assess the found weaknesses, the District's evaluator ordered additional testing in the form of a CTOPP-2 test because "results of this assessment are valuable because children who struggle in these areas [of the KTEA-III] tend to experience difficulty in reading."[50] The results of the CTOPP-2 showed Student scored in the 75th percentile for the Phonological Awareness Composite, the 81st percentile in the Phonological Memory Composite, and the 90th percentile for the Rapid Symbolic Naming Composite.[51] After extensive review of the various educational assessments, in-person evaluations conducted by experienced and trained school administrators, and input from Parents, the District evaluator concluded Student "does not have a disability and therefore is not eligible for special education" under IDEA.[52] The District evaluator found "[r]esults of this evaluation indicated that [Student] does not exhibit a [specific learning disability] due to ... performance, not only on basic reading skills, but also on higher level reading tasks."[53]

Parents disagreed with the District's ER and requested the District provide an IEE in the area of reading at public expense.[54] The District supported its ER but given the Parents' disagreement, met its obligation to file a special education due process complaint.[55] The District paid for the IEE awaiting final ruling.

**D.  Hearing Officer McElligott found flawed methodology in the District's ER.**

Following the due process hearing, Hearing Officer McElligott reviewed the ER, testimony, and documents, including testimony from Student's mother, school officials, and teachers.[56]

The Hearing Officer first reviewed Pennsylvania's two procedures under its child-find standards.[57] While he does not include the transition sentence, in the next paragraph, Hearing Officer McElligott concluded "the mosaic of evidence leads to the conclusion that, following the

January 2016 ER, too many significant questions hang in the air regarding an understanding of the student's ability/achievement in reading, questions that ultimately support a conclusion that an independent reading evaluation is necessary."[58] The Hearing Officer inartfully, but not erroneously, cites only one of Pennsylvania's two processes but his specified five reasons identify inadequate methodology on both the "response to scientific, research-based intervention" and a "pattern of strengths and weaknesses, relative to intellectual ability as defined by a severe discrepancy between intellectual ability and achievement, or relative to age and grade."[59]

Hearing Officer McElligott specified five reasons for finding the District's methodology did not meet Pennsylvania's mandate:

- "First there is a consistent pattern across 2nd and 3rd grade that the student comprehends very strongly with works of narrative but markedly less so with works of exposition."

- "Second, on this record, it is unclear exactly where the student is instructionally in terms of reading; across 2nd and 3rd grade those levels fluctuate . . ."

- "Third the students standardized assessments show markedly low scores in specific areas of phonological processing and nonsense word decoding, weaknesses that are confirmed by more in-depth phonological assessment."

- "Fourth, in 2nd grade, a very explicit gifted goal in reading (with material at the 4th grade level) was removed from the 3rd grade GIEP, and the student was in regular education instruction at the 3rd grade level (albeit in the highest word study group)."

- "Fifth, there is the truly confounding factor of perceptions by teachers and evaluators that the student rushes through work in such a way that results on assessments may not accurately reflect the student's ability/achievement."[60]

Each of these findings relate to the District's methodology. The Hearing Officer did not address the substantive merits of the District's ER. Instead, the only way we can read his specific findings is challenging the District's methodology. Hearing Officer McElligott found "all of

these factors taken together leave some degree of doubt about the conclusion in the District's January 2016 ER that the student does not have a specific learning disability in reading. Accordingly, an IEE in the form of an independent reading evaluation is in order."[61]

District contends its ER complied with the IDEA's regulatory requirements[62] and, because it did so, its ER is appropriate and the District should not pay for the IEE. District contends because McElligott failed to analyze the IDEA's requirements for an appropriate ER of Student, it is "reasonable to conclude" its evaluation conformed to the IDEA's regulations. We disagree. A fair reading of the Hearing Officer's decision confirms his findings the ER lacked the required methodology.

As District correctly points out, "plaintiffs must prove that the exercise of educational judgment was actually wrong, not merely a matter of doubt."[63] Here, Hearing Officer McElligott, using his professional experience and judgment in educational evaluations, thoroughly reviewed the District's ER, and adduced evidence at a due process hearing. The District's argument it fully complied with the IDEA's procedures, and thus Hearing Officer McElligott must find them to be the prevailing party, is unavailing.

Any other decision based on this record would ignore the Hearing Officer's detailed findings. If we accept the District's argument, Hearing Officer McElligott's expertise and experience would be inconsequential, leave no room for a hearing officer to make findings concerning methodology. To fully develop and inform a more complete understanding of Student's potential learning disability, Hearing Officer McElligott used his wisdom and experience, in conjunction with the District's ER, to find the District's inadequate methodology resulted in an inability to fully understand Student's ability versus achievement in the area of reading requiring an IEE.

10

**E. There is evidence on the record before Hearing Officer McElligott Student may have a specific learning disability in reading, and McElligott did not err in ordering the District to pay for an IEE.**

We analyze together the District's second and third arguments. The District argues there is no evidence to support Student has a specific learning disability and Hearing Officer McElligott erred in concluding "more information was needed" in the form of an IEE in reading paid for by District. The District takes issue with Hearing Officer McElligott's fact findings. We consider the Hearing Officer's factual findings as *prima facie* correct and accept the Hearing Officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion."[64]

The District argues Hearing Officer McElligott "invented a vague and pernicious" standard of review of "some degree of doubt" which constitutes a decision "clearly erroneous as a matter of law." The District further argues Hearing Officer McElligott's finding of "too many significant questions hang in the air regarding an understanding of the student's ability/achievement in reading" is an incorrect as a matter of law. These arguments are unavailing.

As analyzed above, after a thorough review of the evidence, Hearing Officer McElligott concluded he could not determine the findings of the District's ER and provided five specific reasons why, in his educational experience and opinion, the District's flawed methodology requires it pay for the IEE. McElligott did not invent a new standard; he found facts on methodology based on the record before him. Affording Hearing Officer McElligott's decision the "due weight" as we are required on review, his decision to award an IEE in reading is appropriate.

11

### F. The later-acquired IEE is not material to our present issue.

District argues the later-acquired IEE in reading supports its January 2016 ER Student did not have a specific learning disability in reading. We disagree. This is not our issue. First, we are mindful to guard against taking a rearward looking approach in evaluating the appropriateness of the District's ER as cautioned by our Court of Appeals.[65] The conclusions of the IEE, however construed, do not mandate a finding the ER methodology met Pennsylvania law. The purpose of an educational evaluation is to determine the needs of the student. No one can predict the outcome of an evaluation but IDEA and Pennsylvania's child-find mandate requires the District employ certain methods.

### III.   Conclusion

Hearing Officer McElligott evaluated the evidence to reach five specific findings of the District's inadequate methodology leading to its internal Educational Report and now requiring the District pay for an IEE. In the accompanying Order, we deny the District's Motion for Judgment.

---

[1] ECF Doc. No. 24. The facts are largely undisputed, and we take the facts from District's Statement of Undisputed Material Facts ("SUMF") (ECF Doc. No. 25). Student and Parents responded to District's SUMF (ECF Doc. No. 27-4). The parties submitted a supplemented Administrative Record (ECF Doc. No. 26) referred to as "Appendix."

[2] SUMF at ¶¶ 2-3.

[3] *Id.* at ¶ 4.

[4] *Id.* at ¶ 5.

[5] *Id.* at ¶ 14.

[6] *Id.* at ¶ 15.

[7] *Id.* at ¶¶ 16-17.

[8] *Id.* at ¶¶ 18-19, 23; Appendix 1a.

[9] As we find the Hearing Officer's decision appropriate, we need not address Parents' argument the District's payment for the IEE after the Hearing Officer ordered it to do so but before it filed its complaint renders its claim moot.

[10] *H.L. v. Downingtown Area Sch. Dist.*, 624 F.App'x 64, 67 (3d Cir. 2015) (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010)).

[11] 20 U.S.C. §§ 1415(i)(2)(C)(iii).

[12] *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (citing *Board of Educ. of Hendrick Hudson Central Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982)).

[13] *Shore Reg'l High Sch. Bd. of Educ.*,381 F.3d at 199 (citing *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 271 (3d Cir. 2003)).

[14] *Bd. of Educ. of Hendrick Hudson C. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 206 (1982).

[15] *CG v. Pa. Dep't of Educ.*, 888 F.Supp.2d 534, 568-69 (M.D.Pa. 2012) (citing 20 U.S.C. § 1412(a)(3)(A), 34 C.F.R. §300.111; *Anello v. Indian River Sch. Dist.*, 355 F.App'x 594, 596 (3d Cir. 2009); *Richard S. v. Wissahickon Sch. Dist.*, 334 Fed.Appx. 508, 510-511 (3d Cir. 2009)).

[16] *CG*, 888 F.Supp. 2d at 569.

[17] *Id.*

[18] 22 Pa. Code § 14.125 (2).

[19] 20 U.S.C. § 1414(a)(1)(A).

[20] 34 C.F.R. § 300.304; 22 Pa. Code § 14.153.

[21] 20 U.S.C. § 1414; 34 C.F.R. § 300.304.

[22] 34 C.F.R. § 300.304(b).

[23] 20 U.S.C. § 1414(c)(1), (2); 34 C.F.R. § 300.305(a), (c).

[24] *Perrin on behalf of J.P. v. Warrior Run School District*, No. 13-2946, 2015 WL 6746306, *8 (M.D. Pa. Sept. 16, 2015) (citing *L.S. ex rel. K.S. v. Abington Sch. Dist.*, No. 06-5172, 2007 WL

2851268, *12 (E.D. Pa. Sept. 28, 2007), *report and recommendation adopted sub nom. Perrin v. The Warrior Run Sch. Dist.*, No. 13-2946, 2015 WL 6746227 (M.D. Pa. Nov. 4, 2015).

[25] *L.S.,* 2007 WL 2851268, at *12.

[26] *Id.*

[27] *Perrin*, 2015 WL 6746306 at *8 (citing *Cnty. Sch. Bd. of Henrico Cnty., Va. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 307 (4th Cir. 2005)).

[28] *L.S.,* 2007 WL 2851268, at *12.

[29] *Bd. of Educ. of Fayette County, Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007).

[30] Appendix 3a, ¶ 1.

[31] Appendix at 3a-4a, ¶ 5.

[32] *Id.* at 4a, ¶ 6.

[33] *Id.* at 4a, ¶ 11.

[34] *Id.* at 4a-5a, ¶ 12.

[35] *Id.* at 5a, ¶ 13.

[36] *Id.* at 5a, ¶ 14.

[37] *Id.* at 5a, ¶ 15.

[38] *Id.* at 5a-6a, ¶ 16.

[39] *Id.* at 7a, ¶ 17.

[40] *Id.* at 6a, ¶ 18.

[41] *Id.* at 6a, ¶ 19.

[42] *Id.* at 7a, ¶¶ 21-22.

[43] *Id.* at 14a.

[44] *Id.* at 14a-40a.

[45] *Id.* at 15a.

[46] *Id.*

[47] *Id.* at 23a-32a. Testing included the Wechsler Intelligence Scale for Children, Fifth Edition (WISC-V), Kaufman Test of Educational Achievement, Third Edition (KTEA-III), Comprehensive Test of Phonological Processing, Second Edition (CTOPP-2), and the Behavior Assessment Scale for Children, Third Edition (BASC-3).

[48] *Id.* at 27a.

[49] *Id.*

[50] *Id.* at 28a.

[51] *Id.*

[52] *Id.* at 35a.

[53] *Id.* at 36a.

[54] *Id.* at 9a, ¶ 33.

[55] SUMF at ¶¶ 16-17.

[56] Appendix 126a.

[57] *Id.* at 10a.

[58] *Id.* at 11a.

[59] *See* Pennsylvania child-find regulations at n. 18, *infra.*

[60] Appendix at 11a.

[61] *Id.* at 12a.

[62] 34 C.F.R. § 300.304(b),(c).

[63] *Alex R., ex rel. Beth R. v. Forrestville Valley Community Unit Sch. Dist. No. 221*, 375 F.3d 603, 614 (7th Cir. 2004).

[64] *S.H.,* 336 F.3d at 270 (quoting *Carlisle Area Sch. Dist. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995)).

[65] *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir. 1995).